UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| PAUL D. WIEDEMANN,<br><br>        Plaintiff,<br><br>v.<br><br>AHMED MALIK,<br>ELITE ECOM ADVISORS LLC (F/K/A MALIK CONSOLIDATED LLC),<br>MC LOGISTICS LLC, and DOES 1-10,<br><br>        Defendants. | Civil Action No.:<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Paul David Wiedemann ("Plaintiff" or "Wiedemann"), by and through undersigned counsel, files this Complaint against Defendants Ahmed Malik ("Malik"), Elite Ecom Advisors LLC ("Elite Ecom") (formerly known as Malik Consolidated LLC), MC Logistics LLC ("MC Logistics"), and Does 1-10 (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1. This is an action for fraud and for violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 et seq. ("UDTPA").

2. From April 2023 through at least early 2025, Defendants orchestrated and executed an interstate scheme to defraud Plaintiff of hundreds of thousands of dollars by (a) falsely stating that they would use his funds to create and operate (i) an "automated" Amazon Fulfilled by Amazon ("FBA") business and (ii) an "automated" trucking business; and (b) thereafter fabricating various reasons for their delays, creating fraudulent "invoices" for supposed inventory purchased for the FBA store, claiming that Amazon accounts supposedly associated with the stores were not working because of alleged negligence by Plaintiff, asserting that Plaintiff had to pay for "damaged inventory," fabricating third party "3PL - Repackaging" fees that supposedly had to be paid for the

Amazon FBA store to move forward, and when Plaintiff demanded explanations and filed complaints, threatening Plaintiff with legal action and fabricating a non-existent "lawyer" that was used to lend an air of credence to Defendants' threats.

3. Relying on Defendants' detailed—yet fabricated—profit projections, insurance representations, guarantees, invoices, and repeated assurances, Plaintiff wired and otherwise transferred more than **$225,000** to Defendants.

4. To date, Defendants have delivered no functioning Amazon store, no freight truck, no revenues, and no payouts, and instead have shifted blame onto Plaintiff while continuing to solicit additional funds.

5. Defendants' acts and false and misleading statements were intentional, willful, malicious, and part of a wider fraudulent enterprise. Plaintiff seeks compensatory, treble, and punitive damages, attorneys' fees, costs, and all other relief the Court deems just and proper.

## JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different States.

7. Plaintiff is a citizen of North Carolina, residing in Mecklenburg County.

8. Defendant Malik is, upon information and belief, a citizen of Connecticut.

9. Defendant Elite Ecom (formerly known as Malik Consolidated LLC) is a Connecticut limited liability company with its registered principal place of business in New York, New York. Defendant Malik is its managing member.

10. Defendant MC Logistics is a Connecticut limited liability company with its registered principal place of business in Fairfield, Connecticut. Defendant Malik is its managing member.

11. Does 1-10 are associates or co-conspirators of the other Defendants who willingly or recklessly assisted in the other Defendants' fraudulent conduct from locations outside of North Carolina. They are sued as "Does" because their identities and/or roles in and knowledge of the fraud at issue are presently unknown to Plaintiff.

12. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in Mecklenburg County, North Carolina, where Plaintiff resides, received misrepresentations from Defendants, transmitted funds to Defendants, and suffered resulting injuries.

13. This Court has personal jurisdiction over Defendants because each purposely directed fraudulent communications, documents, invoices, and payment demands into North Carolina, knowing that their conduct would cause injury in this State.

## PARTIES

### I. Plaintiff Wiedemann

14. Plaintiff Paul David Wiedemann is a natural person and permanent resident of Charlotte, North Carolina.

### II. Defendants

15. Defendant Ahmed Malik is a natural person who, at all relevant times, controlled, directed, and dominated the corporate Defendants and personally participated in and directed the wrongful conduct alleged herein. On information and belief, Malik permanently resides in and is a citizen of Connecticut.

16. Defendant Elite Ecom Advisors LLC, which changed its name from Malik Consolidated LLC in or around late 2023, is a Connecticut limited liability company. Malik is its founder, chief officer, and controlling member. Elite Ecom is the successor, alter ego, or mere continuation of Malik Consolidated with respect to the Amazon FBA scheme.

17. Elite Ecom is not, to Plaintiff's knowledge, associated with or part of Elite Brands Inc., a separate company with the same registered business address as Elite Ecom. Rather, on information and belief, Elite Ecom uses that address precisely because of its hope that potential victims like Plaintiff, searching for information on Elite Ecom, will mistakenly associate Elite Ecom with Elite Brands Inc.'s legitimate business.

18. Defendant MC Logistics LLC is, upon information and belief, a Connecticut limited liability company. Malik is its founder, chief officer, and controlling member.

19. MC Logistics is not, to Plaintiff's knowledge, associated with or part of M.C. Logistics, LLC, a separate Ohio-based trucking company. Rather, on information and belief, MC Logistics chose its name precisely because of its hope that potential victims like Plaintiff, searching for information on MC Logistics, would mistakenly associate MC Logistics with M.C. Logistics, LLC's legitimate business.

20. Does 1-10 are employees, associates, or co-conspirators of the other Defendants who willingly or recklessly assisted in the other Defendants' fraudulent conduct from locations outside of North Carolina. Their identities are presently unknown to Plaintiff.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Defendants are all citizens of different states from Plaintiff and the amount in controversy exceeds $75,000.

22. This Court has personal jurisdiction over Defendants in this District because Defendants have transacted substantial business throughout the United States, including in this District, and have purposefully and directly targeted persons in North Carolina (including Plaintiff, whom they knew was domiciled in North Carolina) with fraudulent and misleading statements and conduct that they intended to and knew would cause significant economic injury in this State.

# FACTUAL ALLEGATIONS

## I.  Defendants' Initial Solicitation and False Projections

23. In early 2023, interested in finding business-ownership opportunities, Plaintiff was browsing listings on the website "franchiseopportunities.com" and saw an advertisement placed by Defendant Elite Ecom (then operating as Malik Consolidated LLC) and representing that Elite Ecom provided the opportunity to invest in Amazon FBA stores. Interested in the promised prospect of business ownership, Plaintiff used a link on franchiseopportunities.com, which took him to a booking calendar on malikconsolidated.com, where he set a time to be contacted by Defendants.

24. On April 21, 2023, at Malik's direction, a person purporting to be Malik's sales agent, Ashton Mullins, emailed Plaintiff detailed "Projections for Aged Stores," attaching glossy materials touting Malik Consolidated's "100% client success rate"; claiming that any moneys received would be used for the setup, sale, marketing, and maintenance of Amazon FBA stores; asserting that projections were based on past results for clients; stating that Defendants provided "money back guarantees … backed by" prominent insurance agencies; and claiming that Malik Consolidated had previously run "highly successful businesses" for its clients and would "operate[] the entire business" with a team "of expert in-house analysts, marketers, and support representatives," and that it had a "proven track record."

25. Mullins further represented, at Malik's direction, that for a $55,000 investment, Defendants would acquire, outfit, and operate an "Aged Amazon FBA Store" generating net profits of $10,000–$30,000 per month within 12 months.

26. The solicitation materials included:

(a) A slide deck claiming Defendants "contractually guarantee ROI [return on investment] within all stated timeframes" (and also referring to their supposed "Trucking operation," which they would later use to defraud Plaintiff of yet more funds).

(b) Purported certificates of insurance naming Malik Consolidated as insured and promising coverage of up to $3 million in case of company bankruptcy or dissolution.

(c) Sample contracts promising a "100% store buy-back guarantee" if Defendants failed to deliver results.

(d) Detailed projections of Amazon FBA returns, which were claimed to be "based on Real Accounts with similar inventory Spending Patterns" and showed revenues of $637,000 in the first year and $1,209,000 in the second year.

27. In addition, Plaintiff had discussions with Mr. Mullins, as well as another associate of Defendants, Alex Mihalcheon, in which Messrs. Mullins and Mihalcheon, at Defendants' direction, made oral representations consistent with those in the aforementioned written materials.

28. In reality, these solicitation materials and the supposed prior results they claimed were entirely false and fraudulent. Defendants never had any intent to use any moneys they were able to purloin from Plaintiff to acquire, operate, or outfit an Amazon FBA store, but rather intended to pocket the money for themselves and then seek to induce yet more payments from Plaintiff for the supposed purpose of acquiring "inventory" that they also would not purchase. Nor did Defendants have any prior "Real Accounts" that could form the basis of their fabricated "projections." Rather, their enterprise was merely and entirely a fraudulent scheme to maliciously and criminally obtain money from victims like Plaintiff under false pretenses.

## II. Plaintiff's Initial $55,000 Investment

29. Relying on the foregoing representations, and similar false representations made during telephone calls with Defendants and their agents, Plaintiff was induced to enter into a

supposed April 20, 2023 Amazon FBA Investment Agreement (the "Initial FBA Agreement") and, at Defendants' direction, wired **$55,000** to Malik Consolidated on April 28, 2023.

30. The Initial FBA Agreement, drafted by Defendants, provided that Malik Consolidated would use Plaintiff's $55,000 to undertake "setup, sales, marketing and maintenance" of an Amazon FBA store for Plaintiff and that Plaintiff would "recoup the investment within 12 months" or else Defendants would refund Plaintiff his $55,000, plus an additional 20%. In fact, however, this entire arrangement was a sham and fraudulent scheme. Defendants did not, and never had any intent to, set up such a store, operate such a store, or engage in any maintenance of such a store. Nor would Defendants refund any moneys (but would instead later claim that *additional* funds were due and owing based on false representations). Instead, Defendants intended to, and did, use the $55,000 wired by Plaintiff to line their own pockets.

### III. Additional Payments Demanded and Made

31. After wiring Defendants the initial $55,000, Plaintiff repeatedly followed up with Malik and Defendants about the transfer to him of the promised Amazon FBA store. Defendants and their associates initially engaged in delaying tactics, asserting that Plaintiff needed to obtain various licenses, corporate registrations, and corporate formation documents. Plaintiff obtained these documents by May 30, 2023, and sent them to Defendants. A week later, Plaintiff texted his supposed "on-boarding" representative for a status update and was told that the "transfer process" would take three to four weeks. Plaintiff also repeatedly emailed Malik, who simply failed to reply.

32. Finally, in late July, Plaintiff spoke with Defendants' agent, Mr. Mullins, who, again at Defendants' direction, assured Plaintiff that the process was moving forward and that, indeed, now that a 60-day "grace period" had passed, Plaintiff had the opportunity to purchase a second Amazon FBA store for half the price of his initial investment, i.e., $27,500.

33. Still convinced by Defendants' false assurances, on August 4, 2023, Plaintiff wired Malik Consolidated an additional **$27,500** to purportedly purchase a second, and supposedly even "higher-performing," Amazon FBA Account, and executed, on August 21, 2023, a second Amazon FBA Investment Agreement (the "Second FBA Agreement"), which again fraudulently stated that the original $55,000 was to be used "for the setup, sales, marketing, and maintenance" of an Amazon FBA store and further that the new $27,500 payment was to be used to "purchase a new store to produce a higher volume of sales than originally forecasted." Once again, however, Defendants did not use, and never had any intent to use, Plaintiff's funds to set up, market, maintain, or operate any legitimate Amazon FBA store, but rather used that money solely for their own benefit.

34. In the months that followed, Defendants repeatedly demanded, and Plaintiff ultimately paid, numerous additional sums based on fraudulent "invoices" for inventory supposedly purchased for the purported Amazon FBA store or fees or other charges supposedly incurred in connection therewith. These included:

    (a)    $30,390.32 paid in late January to early February 2024 for "inventory" Defendants claimed they had purchased for Plaintiff (and for which Defendants provided fraudulent "invoices");

    (b)    $4,200 paid on February 28, 2024, for additional alleged "inventory";

    (c)    $1,000 paid on August 9, 2024, for supposed third-party fees;

    (d)    $37,046.87 paid on September 19, 2024, for the alleged purchase of "inventory" (and for which Defendants provided fraudulent "invoices");

    (e)    $10,680 paid on November 11, 2024, to cover alleged "damaged inventory"; and

(f) $10,235 paid in January 2025 to pay for the supposed acquisition of a new Amazon account that Defendant represented was necessary for business to continue.

35. In total, Plaintiff paid **in excess of $175,000** to Defendants and their representatives supposedly intended to fund the creation of, inventory for, or operation of, Amazon FBA stores that Defendants did not create, never intended to create, misrepresented, and used solely as a fraudulent means to procure money from Plaintiff. Plaintiff never received a single cent in payment for any "profits" from these operations.

**IV.     The Trucking Automation Scheme**

36. In October 2023, Malik pitched Plaintiff a second fraudulent "automation" opportunity: MC Logistics would purchase and operate a freight truck for Plaintiff, guaranteeing monthly profit shares.

37. In procuring Plaintiffs' ultimate $50,000 "investment" in this fabricated "opportunity," Malik sent Plaintiff a PowerPoint deck regarding this "opportunity," which asserted that MC Logistics offered trucking automation as a "high margin and proven method" that would "reliably produce passive income." This deck claimed that "trucking automation" was a "100% done for you freight and logistics business" and that, after investing, "our partners can sit back, relax, and rest easy knowing they have a stream of passive income." It further claimed that MC Logistics was a "platform that has consistently delivered results," that it hired drivers that "go through an extensive background check, are subject to random drug testing and go through a rigorous aggressive driving course," that it would purchase a truck with "a 2 year manufacture warranty," that it had a "compliance staff" that handled "truck permits and licensing," that it had a "vast network of dispatchers," and that truck loads were "thoroughly examined by a double

9

verification process to maximize each dollar on every load." It further touted investors' "experience as a client," claimed that, with a $50,000 investment, MC Logistics would "purchas[e] a new Truck" and take care of "Permitting, Staffing, Monitoring, Dispatching, HR And More," and provided detailed projections of "investor profit" of $6,850 per month based on "real data." It further claimed that "current partners" were seeing revenues generated "in the first 60 days" after their investment.

38. Once again, the representations made in pitching this "opportunity" were false and fraudulent, and Defendants knew them to be so. Defendants never intended to use any moneys procured to purchase a new truck or operate a trucking business and did not have any "real data" to back up their supposed projections because they were not operating a legitimate business, but a fraud scheme designed to purloin money from victims like Plaintiff.

39. On October 30, 2023, Malik—again purporting to act through MC Logistics—executed a Freight Logistics Investment Agreement providing that Plaintiff would invest $50,000 "for the initial setup, purchasing a new truck, permitting, staffing, monitoring, dispatching, [and] HR." Plaintiff wired the $50,000 to MC Logistics on or about November 10, 2023. However, despite some subsequent promises of payment, Plaintiff never received any payments of profits or other moneys in connection with his "investment" in MC Logistics.

### V. Defendants' Pattern of Misrepresentation and Stonewalling

40. After receiving Plaintiff's money, Defendants never set up a functioning Amazon FBA store, never legitimately purchased inventory for such a store, never purchased a truck, never provided lease documentation, registration, or proof of insurance for any truck, and never paid Plaintiff any trucking revenue or any amounts for the Amazon FBA store. Instead, through a series of misrepresentations, diversions, and threats (in one case invoking a fictitious lawyer), Malik and Defendants falsely procured yet more payments from Plaintiff.

41. Throughout 2023–2024, Defendants repeatedly promised imminent "store launch," "inventory live," or "first payout," then blamed fictitious shipping delays, "verification" issues, or Plaintiff's supposed login errors for their failure to perform, in order to procure yet more payments from Plaintiff.

42. Representative misstatements by Defendants include:

(a) January 24, 2024 – An email from Malik to Plaintiff claimed, "Your first payout will take place on Friday, February 2, 2024." But no such payment was ever made, and Malik knew there was no intent to make such a payment.

(b) January 31, 2024 – An email from Malik to Plaintiff claimed ""[w]e had to change banks and are unable to process your payout for Friday, Feb. 2, 2024." Malik claimed that a check would come directly from Wells Fargo in 10-15 business days, and that the future payment schedule would not be affected. But no such payment or future payments were ever made, and Malik knew there was no intent to make such payments.

(c) February 28, 2024 – An email from Malik sought payment from Plaintiff to complete "an inventory purchase" and that the "last thing I want is for these products to go out of stock and they charge a hefty restocking fee against us." In fact, Malik knew that he did not intend to use any moneys to make an inventory purchase and was seeking solely to defraud Defendant of more money.

(d) March 11, 2024 – In response to an inquiry from Plaintiff about launching his Amazon FBA store, Malik falsely claimed that the delay was because they were "waiting for the last product to be prepped, packaged and then head over to Amazon" and that they had to "reorder" certain inventory.

(e) In September 2024 emails, Malik advised Plaintiff that Amazon had "approved all products" and demanded an immediate $37,000 inventory payment, threatening blacklisting if Plaintiff did not comply. In reality, Defendants had never secured inventory.

43. Defendants also forged or manipulated invoices to feign progress. For example, Defendants issued Invoice # 7351 seeking $37,046.87 for dietary supplements allegedly sourced for Plaintiff's account. But no such inventory existed.

44. When Plaintiff questioned delays and filed complaints with the Better Business Bureau, Defendants retaliated and made threats—accusing Plaintiff of "negligence," threatening to "counter sue for defamation" (copying a purported "lawyer" at "bdlawbrothers.com," a website that does not exist and, on information and belief, did not exist at the time of the email in question), and, on November 13, 2024, issuing a sham "Termination Letter" purporting to cancel the FBA contracts while keeping the funds.

45. To date, no functional Amazon store exists, no freight truck was bought, and no legitimate inventory was ever shipped on Plaintiff's behalf.

## VI. **Plaintiff's Damages**

46. Plaintiff has suffered direct monetary losses amounting to the full amount transferred to Defendants—well in excess of $225,000.

47. Plaintiff has also incurred out-of-pocket expenses, lost business opportunities, emotional distress, and attorneys' fees necessary to investigate and prosecute this action.

48. Defendants' conduct was willful, malicious, and in bad faith, warranting treble and punitive damages.

## CLAIMS FOR RELIEF

## COUNT ONE

I. **Fraud (Common Law)**

49. Plaintiff realleges Paragraphs 1–48 as if fully set forth herein.

50. Defendants, individually and collectively, made false representations of material fact, including but not limited to:

(a) That they operated legitimate businesses on behalf of other clients engaged in the legitimate creation and operation of Amazon FBA stores and the purchasing and operation of freight trucks;

(b) That they would purchase, set up, and operate Amazon FBA stores and a freight truck for Plaintiff;

(c) That the projections they provided were based on real client successes, when in fact they were fabricated;

(d) That Plaintiff's funds would be used exclusively for the purposes represented;

(e) That Defendants had insurance backing, a 100% buy-back guarantee, and a track record of 100% client success;

(f) That inventory purchases reflected on invoices that they sent to Plaintiff had occurred or would occur promptly; and

(g) That payouts and profit distributions were scheduled and forthcoming.

51. At the time the representations were made, Defendants knew they were false or made them with reckless disregard for the truth.

52. Defendants made the misrepresentations with the intent that Plaintiff would rely on them and transfer funds.

53. Plaintiff reasonably and justifiably relied on the misrepresentations, as evidenced by his repeated payments and continued cooperation despite delays.

54. Plaintiff has been injured and damaged in an amount to be proven at trial, but not less than **$225,000**, as a direct and proximate result of Defendants' fraud.

55. Because Defendants acted willfully, wantonly, and with malice, Plaintiff is entitled to punitive damages.

## COUNT TWO

II. **Violation of the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1 et seq.)**

56. Plaintiff realleges Paragraphs 1–55 as if fully set forth herein.

57. Defendants engaged in commerce by soliciting investments, selling supposed automation services, issuing invoices, and accepting payments.

58. Defendants' conduct—including false advertising, fraudulent inducement, forgery of invoices, misappropriation of funds, and threats against Plaintiff—constitutes unfair and deceptive acts or practices within the meaning of N.C. Gen. Stat. § 75-1.1.

59. The acts were in or affecting commerce and caused Plaintiff ascertainable losses in excess of $225,000.

60. Defendants' conduct was willful and intentional, entitling Plaintiff to treble damages under N.C. Gen. Stat. § 75-16, as well as reasonable attorneys' fees under § 75-16.1.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally, and award:

A. Compensatory damages in an amount to be determined at trial, but not less than **$225,000**;

B. Treble damages pursuant to N.C. Gen. Stat. § 75-16;

C. Punitive damages for Defendants' willful and malicious fraud;

D. Pre- and post-judgment interest as allowed by law;

E. Reasonable attorneys' fees and costs under N.C. Gen. Stat. § 75-16.1 and as otherwise permitted; and

F. Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: October 17, 2025

Respectfully submitted,

WINSTON & STRAWN LLP

*/s/ Jeffrey Wilkerson*
Jeffrey Wilkerson
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Telephone: (704) 350-7700
Facsimile: (704) 350-7800
Email: jwilkerson@winston.com

*Attorney for Plaintiff Paul D. Wiedemann*